# EXHIBIT "A"

# EXCLUSIVE LABORATORY SERVICES AGREEMENT

This Exclusive Laboratory Services Agreement (this "**Agreement**") is entered into by and between Antech Diagnostics, Inc., ("**Antech Diagnostics**") and the Practice Owner listed below ("**Practice Owner**") as of the Effective Date (as defined below) with respect to each Practice listed below (the "**Practice(s)**"). This Agreement shall consist of this cover page, the attached terms and conditions (the "**Standard Terms and Conditions**") and all annexes, exhibits, schedules, and attachments referred to herein and therein.

| | | |
|---|---|---|
| **Parties:** | **Antech Diagnostics:** | Antech Diagnostics, Inc. |
| | Address: | 17672 Cowan Ave. Irvine, CA 92614 |
| | Attention: | Contracts Department |
| | **Practice Owner(s):** | Dr. Kathleen Hefner |
| | Address: | 171 E Saddle River Rd<br>Saddle River, NJ 07458 |
| | Telephone: | |
| | E-mail: | |
| | **Practices(s):** | Animal Hospital Of Saddle River |
| | Client No.: | 180505 |
| | Address: | 171 E Saddle River Rd, Saddle River, NJ 07458<br>(attach additional pages to this cover page as necessary to include all covered Practices) |

## AGREEMENT

**Effective Date:** 09-01-2015

**Term:** 6 years (the "**Initial Term**") commencing on the Effective Date, or, if the Effective Date does not fall on the first day of the month, the first day of the month immediately following the Effective Date. The Term of this Agreement shall automatically renew at the end of the then current Term as set forth in the attached Standard Terms and Conditions.

**Loyalty Commitment:** As an incentive for Practice Owner to enter into this Agreement for the Initial Term, subject to the terms and conditions of this Agreement, Antech Diagnostics will provide to Practice Owner the incentives identified below and/or in any additional annexes attached hereto (the "**Incentives**").

Practice Owner's right to the Incentives, including continued access to the Incentives, is expressly conditioned on Practice Owner complying with the Annual Minimum Fees and Exclusivity requirements set forth below and the other terms and conditions of this Agreement.

**Equipment/ Practice Management System Contribution:** As an incentive for Practice Owner to enter into this Agreement for the Initial Term, subject to the terms and conditions of this Agreement, Antech Diagnostics agrees to contribute up to a maximum amount of $51,090, as more specifically set forth on the Equipment/Practice Management System Contribution Annex attached hereto, towards the purchase of the equipment and/or practice management system identified on the Equipment/Practice Management System Contribution Annex attached hereto.

**Loan:** As an incentive for Practice Owner to enter into this Agreement for the Initial Term, subject to the terms and conditions of this Agreement, Antech Diagnostics agrees to loan Practice Owner $22,500 for a period of 6 years at an annual interest rate of 7%, as more specifically set forth on the Loan Annex attached hereto.

| | |
|---|---|
| **Annual Minimum Fees:** | In consideration of the Incentives provided pursuant to this Agreement, Practice Owner agrees to purchase, after application of all discounts and credits, veterinary diagnostic laboratory services ("**Laboratory Services**") from Antech Diagnostics in an aggregate amount of not less than $33,600 per "Contract Year" (i.e., the 12-month period beginning on the Effective Date and each anniversary of the Effective Date) (the "**Annual Minimum Fees**"). |
| **Accounts Receivable:** | As of the Effective Date, Practice Owner has an outstanding accounts receivable balance due and payable to Antech Diagnostics of approximately $22,500.00 (the "**A/R Balance**"). Practice Owner agrees that the proceeds of the Loan shall be retained by Antech Diagnostics to repay the A/R Balance. If the A/R Balance is greater than the Loan at the time funds are disbursed, Practice Owner remains responsible to promptly pay the balance. The failure to make such payment as set forth herein or to stay current with payment of future invoices shall be deemed to be an Event of Default under this Agreement. |
| **Exclusivity:** | During the Term, Practice Owner shall cause all Laboratory Services that are to be performed for and on behalf of the Practices(s), to be performed by a veterinary diagnostic laboratory owned or operated by Antech Diagnostics (an "**Antech Diagnostics Lab**"). Notwithstanding the foregoing: (i) the Practice(s) may use non-Antech Diagnostics veterinary diagnostic laboratories provided the fees paid to such non-Antech Diagnostics veterinary diagnostic laboratories in the aggregate during each Contract Year are less than 10% of all fees paid by or on behalf of the Practice(s) for veterinary laboratory services during that Contract Year; (ii) the Practices(s) may use a non-Antech Diagnostics veterinary diagnostic laboratory to perform any services that an Antech Diagnostics Lab cannot perform; and (iii) to the extent so equipped, the Practice(s) may use laboratory equipment owned and operated by Practice Owner, and located on the premises of the Practice(s). |

**By signing below the parties agree to all the terms and conditions of this Exclusive Laboratory Services Agreement, the attached Standard Terms and Conditions and all annexes and attachments referred to herein. Nothing herein shall apply to Antech Imaging Services provided by Antech Diagnostics or its affiliates. This Agreement is not binding on Antech Diagnostics until executed below by an authorized representative of Antech Diagnostics.**

**"Practice Owner"**

| *Signature* | *Name* | *Title* | *Date* |
|---|---|---|---|
| Kathleen Hefner, DVM | Kathleen Hefner | PRACTICE OWNER | |

**"Antech Diagnostics"**

| *Signature* | *Name* | *Title* | *Date* |
|---|---|---|---|
| Matthew Koch | | | |

## EXCLUSIVE LABORATORY SERVICES AGREEMENT
## STANDARD TERMS AND CONDITIONS

1. General. The Exclusive Laboratory Services Agreement, between Antech Diagnostics and Practice Owner, including all annexes, exhibits, schedules and attachments hereto and thereto and these standard terms and conditions (these "**Terms and Conditions**"), shall be referred to as the "**Agreement**." Capitalized terms used but not defined in these Terms and Conditions have the same meanings given in the Agreement.

2. Laboratory Services. All Laboratory Services provided by Antech Diagnostics pursuant to this Agreement are provided in accordance with and subject to all terms and conditions set forth in the ANTECH® Service Directory in effect at the time the Laboratory Services are performed. In the event of any conflict between this Agreement and the ANTECH® Service Directory, this Agreement shall control.

3. Term. The initial term of this Agreement is as set forth on the cover page (the "**Initial Term**"). This Agreement shall automatically renew for an additional 24 month period (the "**Renewal Term**") upon the expiration of the Initial Term or any Renewal Term, unless written notice is given of a party's intent to terminate this Agreement at least 12 months prior to the end of the then current Term. The terms of any Annex shall not renew, unless the Annex specifically states that it automatically renews.

4. Payment Terms. Payment in full for Laboratory Services shall be made by Practice Owner within twenty (20) days after receipt of invoice. Any amount owed by Practice Owner beyond the date such amount became due and payable shall accrue a late charge at a rate of 1.5% per month (18% per year), or the maximum rate provided by law, whichever is less. Practice Owner shall pay all collection costs incurred by Antech Diagnostics in connection with this Agreement including, but not limited to, collection agency fees, reasonable attorneys' fees and court costs. Additionally, if Practice Owner is delinquent in paying any amount owed to Antech Diagnostics, then in addition to any other rights and remedies available to Antech Diagnostics under law, in equity, or under contract, Antech Diagnostics may by notice to Practice Owner, suspend provision of the Services until all outstanding amounts, including any applicable late charges are paid in full.

5. Intentionally omitted.

6. Pricing. The prices charged for Laboratory Services shall be as set forth on Antech Diagnostics' Fee Schedule, as modified from time to time for its customers generally, and in effect at the time the Laboratory Services are performed.

7. Confidential Information. Without the prior written consent of duly authorized representative of Antech Diagnostics, except as required by law or judicial process, Practice Owner shall not, and Practice Owner shall cause its officers, directors, employees, representatives and affiliates not to disclose any terms of this Agreement or any pricing information related to the Laboratory Services provided hereunder. A breach of any of the promises or agreements contained in this Section will result in irreparable and continuing damage to Antech Diagnostics for which there will be no adequate remedy at law, and Antech Diagnostics shall be entitled to injunctive relief and/or a decree for specific performance in addition to any other remedy to which it may be entitled.

8. Termination by Antech Diagnostics; Remedies. The occurrence of any one of the following events shall constitute an event of default by Practice Owner (each an "**Event of Default**"): (i) Practice Owner fails to satisfy the Annual Minimum Fees obligation for any Contract Year set forth in the Agreement; (ii) Practice Owner is in material breach of its obligations under this Agreement (other than (A) the Annual Minimum Fees obligation or (B) the payment obligations of Section 4), including without limitation the exclusivity or confidentiality obligations set forth herein and fails to cure such default within thirty (30) days following notice thereof from Antech Diagnostics; or (iii) Practice Owner fails to pay any amounts pursuant to this Agreement in accordance with the terms hereof and Practice Owner fails to cure such default within twenty (20) days following notice thereof from Antech Diagnostics.

Upon an Event of Default set forth in clause (i) of the previous sentence, Antech Diagnostics as its sole remedy, may upon written notice delivered not more than 120 days following the end of the applicable Contract Year, declare the amount of any (x) Incentives previously paid, credited or provided to Practice Owner (including, without limitation the value of any credits, rebates or coupons provided to Practice Owner, but excluding any trade/price discounts provided to Practice Owner), less the pro-rated value of any Incentives attributable to the full Contract Years prior to the Contract Year in which such Event of Default occurs, and (2) unpaid amounts for Laboratory Services performed, to be immediately due and payable to Antech Diagnostics; provided, however, that if Practice Owner has failed to satisfy at least 50% of the Annual Minimum Fee obligation for such Contract Year, Antech Diagnostics may in its sole discretion in addition to payment of the amounts specified above terminate this Agreement which termination shall be effective upon delivery of the written notice set forth above. Upon any other Event of Default, Antech Diagnostics may, in addition to any other remedy to which it may be entitled pursuant to this Agreement or at law or in equity, (x) declare the amount of any (1) Incentives previously paid, credited or provided to Practice Owner (including, without limitation the value of any credits, rebates or coupons provided to Practice Owner, but excluding any trade/price discounts provided to Practice Owner), and (2) unpaid amounts for Laboratory Services performed, to be immediately due and payable to Antech Diagnostics, and/or (y) terminate this Agreement, which termination shall be effective immediately upon

**EXCLUSIVE LABORATORY SERVICES AGREEMENT**
**STANDARD TERMS AND CONDITIONS**

delivery of written notice to Practice Owner. Except as expressly set forth herein, nothing herein shall be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which Antech Diagnostics may be entitled.

9. Limitations of Liability. THESE TERMS AND CONDITIONS SUPERSEDE ANY PRIOR AGREEMENTS OR REPRESENTATSIONS, INCLUDING REPRESENTATIONS MADE IN ANY ANTECH DIAGNOSTICS' SALES LITERATURE OR ADVICE GIVEN TO YOU BY ANTECH DIAGNOSTICS OR AN AGENT OR EMPLOYEE OF ANTECH DIAGNOSTICS, IN CONNECTION WITH YOUR EXECUTION OF THIS AGREEMENT. TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW, IN NO EVENT SHALL ANTECH DIAGNOSTICS BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER LEGAL THEORY AND WHETHER ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10. Governing Law; Venue. This Agreement is to be governed by and construed in accordance with the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of California. Each of the parties hereto hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Courts for the Central District of California (or, in the event such courts lack subject matter jurisdiction, the courts of the State of California situated in Los Angeles County) over any suit, action or proceeding. If any party commences any proceedings with respect to this Agreement the prevailing party in such litigation or other proceeding shall be entitled to recover from the other party all costs of the proceedings, including reasonable costs, attorney fees, professional fees and other expenses incurred by such prevailing party in such proceeding.

11. Severability. If any provision of this Agreement is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement will remain in full force and effect.

12. Waiver. No failure and no delay in exercising, on the part of any party, any right under this Agreement will operate as a wavier thereof, nor will any single or partial exercise of any right preclude the further exercise of any other right. No course of dealing or course of performance may be used to evidence a waiver or limitation of Practice Owner's obligations under this Agreement.

13. Notices. All notices, requests, demands, claims and other communications hereunder will be in writing. Any notice, request, demand, claim or other communication hereunder will be deemed duly given if it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient at the address set forth next to such recipient on the cover page hereto.

14. Amendments and Assignments. This Agreement may be amended only by a written agreement executed by all of the parties to this Agreement. Antech Diagnostics may assign its rights and obligations under this Agreement without Practice Owner's prior written consent. Practice Owner may not assign its rights and obligations under this Agreement without the prior written consent of Antech Diagnostics; provided, however, that Practice Owner may assign this Agreement without Antech Diagnostics' prior written consent to any person or entity that acquires all or substantially all of the assets of the Practice(s) (whether by way of sale of stock, assets, merger or otherwise), provided that any such assignee shall deliver to Antech Diagnostics a written assumption of all obligations and liabilities of Practice Owner under this Agreement. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

15. Force Majeure. Antech Diagnostics shall not be liable for any failure to perform caused by or in any manner arising from fires, floods, accidents, riots, acts of God, war, governmental interference or embargoes, strikes, labor difficulties, any shortage or labor, fuel, power, materials or supplies, transportation delays, delays in deliveries by Antech Diagnostics vendors or any other cause or causes (whether or similar in nature to any of these hereinbefore specified) beyond Antech Diagnostics' control.

16. Entire Agreement. The Agreement, these Terms and Conditions, and all annexes, exhibits, schedules, and attachments referred to herein, constitute the entire understanding and agreement of the parties hereto relating to the subject matter hereof and thereof, and supersede any prior or contemporaneous statements, understandings or agreements. Any term of any purchase order or other document that Practice Owner provides to Antech Diagnostics that is any way inconsistent with or in addition to the terms set forth herein will not become a part of the contract between Practice Owner and Antech Diagnostics or be binding in any way on Antech Diagnostics.

17. Survival. All provisions of this Agreement, including, without limitation Section 7 through 17, that either expressly by their terms survive or, by their nature are to survive or come into or continue in force and effect after the expiration or termination of this Agreement shall remain in effect and be enforceable following such expiration or termination.

**ANNEX**

**EQUIPMENT/PRACTICE MANAGEMENT SYSTEM CONTRIBUTION**

1. General. The Exclusive Laboratory Services Agreement, between Antech Diagnostics, Inc. (**"Antech Diagnostics"**), and Practice Owner, including all annexes, exhibits, schedules, and attachments thereto and hereto, shall be referred to as the **"Agreement."** Capitalized terms used but not defined in this annex shall have the same meanings given in the Agreement.

2. Equipment.

a. Contribution. As an incentive for Practice Owner to enter into the Agreement for the Initial Term, subject to the terms and conditions of the Agreement, Antech Diagnostics agrees to contribute, on Practice Owner's behalf, up to a maximum amount of $51,090 (the **"Contribution"**) towards the purchase of the equipment and/or practice management system identified on the attached Schedule(s) of Equipment (the **"Equipment"**) from the seller identified on the attached Schedule(s) of Equipment (the **"Seller"**). The Contribution shall be made by Antech Diagnostics directly to the Seller following receipt of an invoice for the Equipment.

b. Taxes. Practice Owner shall be responsible for, and shall pay, all taxes and fees imposed or levied by any governmental authority with respect to the Contribution and/or the purchase of the Equipment, including without limitation, any sales, use, excise, franchise, and any similar taxes and tax-like fees and charges.

c. Acknowledgement. Practice Owner acknowledges and agrees that: (i) Practice Owner has independently selected Equipment and the supplier of the Equipment; (ii) Practice Owner shall be responsible for, and shall pay, all costs and expenses relating to the shipping, delivery, assembly, installation, testing, adjusting, servicing, operation and acceptance of the Equipment; and (iii) Seller is not Antech Diagnostics' agent, or authorized to bind Antech Diagnostics or waive or alter any provision of the Agreement.

d. Warranty Coverage. Practice Owner agrees to purchase from, and maintain with a vendor acceptable to Antech Diagnostics maintenance and warranty coverage for the Equipment during the Initial Term.

e. Disclaimer of Warranties. PRACTICE OWNER ACKNOWLEDGES THAT PRACTICE OWNER HAS MADE THE SELECTION OF THE EQUIPMENT BASED ON PRACTICE OWNER'S OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE UPON STATEMENTS MADE BY ANTECH DIAGNOSTICS OR ANTECH DIAGNOSTICS' AGENTS, EMPLOYEES OR SALESPERSONS. PRACTICE OWNER FURTHER ACKNOWLEDGES THAT ANTECH DIAGNOSTICS IS NOT THE MANUFACTURER, VENDOR, DEVELOPER, DISTRIBUTOR, PUBLISHER OR LICENSOR OF THE EQUIPMENT AND ANTECH DIAGNOSTICS SHALL HAVE NO OBLIGATION TO ASSEMBLE, INSTALL, TEST, ADJUST OR SERVICE THE EQUIPMENT. PRACTICE OWNER FURTHER ACKNOWLEDGES AND AGREES THAT ANTECH DIAGNOSTICS SHALL HAVE NO LIABILITY FOR ANY CLAIM, LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE RESULTING, DIRECTLY OR INDIRECTLY, FROM THE SELECTION, QUALITY, CONDITION, MERCHANTABILITY, SUITABILITY, DELIVERY, INSTALLATION, USE, OPERATION, PERFORMANCE, OR LACK OR INADEQUACY THEREOF, OF ANY ITEM OF EQUIPMENT AND THAT ANY EQUIPMENT MADE AVAILABLE TO PRACTICE OWNER PURSUANT TO THE AGREEMENT IS MADE AVAILABLE "AS IS."

**By signing below Practice Owner agree to all the terms and conditions of this Annex to Exclusive Laboratory Services.**

"Practice Owner"

| *Signature* | *Name* | *Title* | *Date* |
|---|---|---|---|
| Kathleen Hefner, DVM | Kathleen Hefner | PRACTICE OWNER | ____________ |

## ANNEX LOAN

1. General. The Exclusive Laboratory Services Agreement, between Antech Diagnostics, Inc. and its subsidiaries (**"Antech Diagnostics"**), and Practice Owner, including all annexes, exhibits and schedules thereto and hereto and these terms and conditions, shall be referred to as the **"Agreement."** Capitalized terms used but not defined in this annex have the same meanings given in the Agreement.

2. Loan.

a. Loan Amount. As an incentive for Practice Owner to enter into the Agreement for the Initial Term, subject to the terms and conditions of the Agreement, Antech Diagnostics agrees to loan Practice Owner an amount equal to $22,500 for a period of 6 years at an annual interest rate of 7.0% (the **"Loan"**). Practice Owner agrees that the proceeds of the Loan shall be retained by Antech Diagnostics to repay the A/R Balance.

b. Promissory Note. The Loan is subject to and conditioned upon Practice Owner's execution and delivery of the Promissory Note attached to this Annex (the **"Note"**).

c. Payment Schedule. The Loan, subject to the terms and conditions of the Promissory Note, shall be repayable on the following schedule and in the following amounts:

| Payment Date | Principal Amount | Interest | Annual Loan Payment |
|---|---|---|---|
| SEP-01-2016 | $3,750 | $1,575 | $5,325 |
| SEP-01-2017 | $3,750 | $1,312 | $5,062 |
| SEP-01-2018 | $3,750 | $1,050 | $4,800 |
| SEP-01-2019 | $3,750 | $788 | $4,538 |
| SEP-01-2020 | $3,750 | $525 | $4,275 |
| SEP-01-2021 | $3,750 | $262 | $4,012 |

d. Loan Forgiveness. Subject to the terms and conditions of the Agreement and the Note, if in any given year that an Annual Loan Payment is due, Practice Owner (i) satisfies in full the Annual Minimum Fees requirement and complies with the exclusivity provisions set forth in the Agreement, (ii) pays all amounts payable under the Agreement when due, and (iii) is not otherwise in default under the Agreement, Antech Diagnostics will forgive the Annual Loan Payment for that year.

f. Taxes. Practice Owner shall be responsible for, and shall pay, all taxes and fees imposed or levied by any governmental authority with respect to any loan forgiveness. Practice Owner shall provide to Antech Diagnostics with a correct taxpayer identification number on IRS Form W-9 and shall provide Antech Diagnostics with such other forms, documents and information that Antech Diagnostics may reasonably request to comply with all applicable laws and tax reporting and withholding obligations.

**By signing below Practice Owner agree to all the terms and conditions of this Annex to Exclusive Laboratory Services Agreement.**

**"Practice Owner"**

| *Signature* | *Name* | *Title* | *Date* |
|---|---|---|---|
| Kathleen Hefner, DVM | Kathleen Hefner | Practice Owner | |

**PROMISSORY NOTE**

$22,500

Los Angeles, California
09-01-2015

**FOR VALUE RECEIVED**, the undersigned, Dr. Kathleen Hefner ("**Borrower**"), promises to pay to the order of Antech Diagnostics, Inc. a California corporation, and its successors and assigns ("**Lender**"), at 17672 Cowan Ave., Irvine, CA 92614 or at such other address as Lender may from time to time designate in writing, the principal sum of $22,500, together with interest on the unpaid principal amount as provided in Section 1 below. This Promissory Note (the "**Note**") is being issued pursuant to the Exclusive Laboratory Services Agreement between Borrower and Lender, dated as of the date hereof (the "**Agreement**").

1. Required Annual Payments. So long as this Note is outstanding, Borrower shall for a period of 6 years make equal annual payments of principal plus accrued and unpaid interest, with payments due on the annual anniversary date of this Note until repayment of this Note in full (the "**Annual Loan Payment**"). All outstanding principal and interest shall be due and payable on the 6th anniversary of the date of this Note. All payments shall be applied first to interest and then to principal. The acceptance by Lender of any payment which is less than payment in full of all amounts due and owning at such time shall not constitute a waiver of Lender's right to receive payment in full at such time or at any prior or subsequent time. All payments hereunder shall be made without set-off or counterclaim to the Lender in lawful money of the United States at the address for Lender set forth above, or at such other place as may be designated by the Lender to the Borrower in writing. Borrower may prepay amounts owed under this Note at any time without additional cost or penalty of any kind.

2. Interest Rate. Until paid in full, interest shall accrue on the principal amount outstanding hereunder from time to time from (and including) the date of this Note to (but excluding) the date all principal shall have been paid in full at an annual fixed rate of interest equal to 7% per annum, or the maximum rate permitted by applicable law, whichever is lesser. Interest shall be calculated on the basis of a 365 day year and will be charted for each calendar day on which any principal is outstanding. Upon the occurrence of an Event of Default, the Lender may, in addition to any other rights of the Lender, in its sole discretion, declare that the rate of interest on all outstanding principal shall increase, from the date of such declaration, to 18% per annum, or the maximum rate permitted by applicable law, whichever is lesser.

3. Usury. It is the intention of Borrower and Lender to conform strictly to applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under applicable law then, in that event, notwithstanding anything to the contrary in any agreement entered into in connection with this Note, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note or under any of the other aforesaid agreements or otherwise in connection with this Note shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited on this Note by the Lender (or if this Note shall have been paid in full or satisfied by conversion, refunded to Borrower); and (ii) in the event that maturity of this Note is accelerated by reason of an election by Lender resulting from any default hereunder or otherwise, then such consideration that constitutes interest may never include more than the maximum amount of interest allowed by applicable law, and any interest in excess of the maximum amount of interest allowed by applicable law, if any, provided for in this Note or otherwise shall be canceled automatically as of the date of such acceleration and, if theretofore prepaid, shall be credited on this Note (or if this Note shall have been paid in full or satisfied by conversion, refunded to Borrower).

4. Intentionally Omitted.

5. Loan Forgiveness. Notwithstanding the forgoing, so long as in any given year that an Annual Loan Payment is due, Borrower (i) satisfies in full the Annual Minimum Fees requirement and complies with the exclusivity provisions set forth in the Agreement, (ii) pays all amounts payable under the Agreement when due, and (iii) is not otherwise default under the Agreement, Lender shall forgive the Annual Loan Payment for that year and Borrower shall not be required to the make the Annual Loan Payment to Lender for that year.

6. Costs of Collection and Legal Fees. The Borrower shall be liable to the Lender and shall pay to the Lender immediately on demand as part of its liability under this Note, all costs and expenses of the Lender, including reasonable attorneys' fees and disbursements of the Lender's counsel, incurred in the collection or enforcement of the Lender's rights under this Note, whether within or apart from any legal action or proceeding.

7. Events Of Default. Each of the following events shall constitute an "**Event of Default**" under this Note: (i) Borrower fails to pay when due any debt, liability or obligation of Borrower to Lender, including without limitation any obligation under the Agreement or this Note, and such failure shall continue ten (10) or more days after Lender shall notify Borrower in writing of such failure; (ii) Borrower is in material breach of the terms and conditions of this Note or the Agreement, including without limitation, the or confidentiality obligations set forth therein; or (iii) if Borrower

becomes insolvent or ceases to do business as a going concern or a petition is filed by or against Borrower under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date.

8. Remedies. Upon an Event of Default, Lender may, in addition to any other remedy to which it may be entitled pursuant to this Note, at law or in equity, (i) declare that the entire outstanding unpaid principal balance of this Note, together with all accrued and unpaid interest thereon, shall, without notice, become immediately due and payable; except that, upon the occurrence of an Event of Default under Section 7(iii) above, the entire outstanding unpaid principal balance of the Note, together with all accrued and unpaid interest thereon, shall immediately and automatically become due and payable, without presentment, protest or other notice of any kind, all of which Borrower hereby waives and (ii) Lender may exercise and enforce any and all rights and remedies available to Lender at law or equity. Failure by the Lender to exercise such remedies shall not constitute a waiver of the right to exercise such remedies in the case of any subsequent Event of Default. Except as expressly provided herein, the rights and remedies of Lender created by this Note are cumulative and in addition to any other rights and remedies otherwise available at law or in equity. Nothing herein shall be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which Lender may be entitled.

9. Intentionally Omitted.

10. INDEMNIFICATION. BORROWER SHALL DEFEND, HOLD HARMLESS AND INDEMNIFY LENDER, ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SHAREHOLDERS, MEMBERS, PARTNERS, AFFILIATES, REPRESENTATIVES, CONSULTANTS AND ADVISORS AND ITS SUCCESSORS AND ASSIGNS AGAINST ANY LIABILITY, CLAIM, DEMAND, CAUSE OF ACTION, COST OR EXPENSE (INCLUDING, WITHOUT LIMITATION, ATTORNEY AND OTHER PROFESSIONAL FEES AND DISBURSEMENTS) ARISING OUT OF THIS LOAN.

11. Certain Waivers. The Borrower hereby waives presentment, notice of dishonor, protest, notice of protest and any and all other notices or demands (other than demand for payment) in connection with the delivery, acceptance, performance, default or enforcement of this Note.

12. Governing Law; Venue. This Note is to be governed by and construed in accordance with the internal laws of the State of California, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of California or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of California. Each of the parties hereto hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Courts for the Central District of California (or, in the event such courts lack subject matter jurisdiction, the courts of the State of California situated in Los Angeles County) over any suit, action or proceeding arising in connection with this Note.

13. Severability; Waiver. If any provision of this Note is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Note will remain in full force and effect. No failure and no delay in exercising, on the part of any party, any right under this Note will operate as a wavier thereof, nor will any single or partial exercise of any right preclude the further exercise of any other right. No course of dealing or course of performance may be used to evidence a waiver or limitation of Borrower's obligations under this Note.

14. Amendments and Assignments. This Note may be amended only by a written agreement executed by all of the parties to this Note. Borrower may not assign or delegate its rights or obligations under this Note without the prior written consent of Lender and any such attempted assignment is void. Lender may assign its rights and obligations under this Note without Borrower's prior written consent. This Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, the Borrower has caused this Promissory Note to be executed as of the date first written above.

"Borrower"

| *Signature* | *Name* | *Title* | *Date* |
|---|---|---|---|
| Kathleen Hefner, DVM | Kathleen Hefner | Practice Owner | 9/2/15 |

## ANNEX
## PRICING AND DISCOUNTS

1. General. The Exclusive Laboratory Services Agreement, between Antech Diagnostics, Inc. and its subsidiaries ("**Antech Diagnostics**"), and Practice Owner, including all annexes, exhibits and schedules thereto and hereto and these terms and conditions, shall be referred to as the "**Agreement.**" Capitalized terms used but not defined in this annex have the same meanings given in the Agreement.

2. Pricing. The prices charged for Laboratory Services shall be as set forth on Antech Diagnostic's Fee Schedule, as modified from time to time for its customers generally, and in effect at the time the Laboratory Services are performed, subject to any Trade Discounts identified below.

3. Intentionally Omitted

4. Special Pricing: As an additional incentive for Practice Owner to enter into the Agreement for the Initial Term, Practice Owner shall be charged for the Laboratory Services identified on the attached Special Pricing Schedule as specified ("**Special Pricing**"). The Special Pricing Schedule, may be modified from time to time by Antech Diagnostics. The Special Pricing in effect as of the date immediately prior to the commencement of any Renewal Term shall automatically renew upon commencement of a Renewal Term.

## SPECIAL PRICING SCHEDULE

| Unit Code | Description | Special Price |
|---|---|---|
| 95230 | General Senior Profile/General Profile (No UA) | $62.53 |
| AC705 | Senior Profile 1 w/Accuplex | $77.48 |
| AC805 | Ova and Parasite w/Accuplex | $25.60 |
| AC808 | Ova and Parasite, Giardia w/Accuplex | $32.60 |
| ACTH2 | Cortisol Serial 2 (ACTH) | $56.32 |
| ADD190 | Add-On Total T4 | $19.22 |
| ADD300 | Add on Post T4 | $19.22 |
| CYTO | Cytology | $57.00 |
| FBX | Histopathology, Full Written Report | $66.00 |
| M130 | Urine MIC Culture | $63.82 |
| SA020 | Superchem w/ CBC | $43.09 |
| SA090 | Senior Comprehensive | $68.80 |
| SA705 | Senior Wellness Profile 1 | $62.53 |
| T495 | Total T4 | $19.22 |
| T497 | T4, Post Pill | $19.22 |
| T770 | Urine Cortisol/Creatinine Ratio | $43.00 |
| T805 | Ova and Parasites With Centrifugation | $10.65 |
| T808 | Ova and Parasite/Giardia (ELISA) | $13.00 |




# Order Summary

**Order No: QUO-29904-Y9R4R8**

Revision: 2

## SOUND SMART DR™

*Incorporates the wisdom gained from thousands of systems, tens of thousands of users and millions of exams.*

### Proven, Flat Panel Sensor Technology

- Sizes: 14x17,17x17
- 25% electronic noise reduction

### MUSICA™ Intelligent Image Processing

- Sharp bone and soft tissue detail in the same image
- Consistent image quality across anatomy, views and users
- Realistic representation of anatomy, not over processed
- Gold standard in human and veterinary radiology

### SMART Flow

The easiest, most intuitive imaging experience ever created specifically for veterinary use with speed, efficiency and accuracy in mind.

### SMART User

Placing advanced features at the fingertips, enabling novice to expert to get more out of radiography than ever before.

### SMART Sync

Delivering effortless image routing from acquisition to review to sharing to storage.

**SMART DR Acquisition Device**

- Dell Industrial SFF Workstation
- Dual 500GB HD (50,000 DICOM DX Images)
- Intel i7-3770s 3.0Ghz, 8GB Ram, HD4000 Video
- 23" Medical Touch Screen
- 5 Year Available Warranty (4hr, 24/7 support)
- Sound Recovery Onboard
- H:11.42" x W:3.65" x D:12.28"
- Weight: 12.57 lbs

**ReadyView Workstation**

- Dell Industrial AIO Workstation
- 500GB HD (50,000 DICOM DX Images)
- Intel i7-3770s 3.0Ghz, 8GB Ram, HD4000 Video
- 23" Dell (1920 x 1080 60Hz)
- 5 Year Available Warranty (Next Business Day)
- Sound Recovery Onboard
- H:27.27" x W:14.05" x D:23.37"
- Weight: 16.8 lbs

**SoundBank**

- Dell Industrial MT Workstation
- Dual 1TB HD (100,000 DICOM DX Images)
- Intel i7-3770s 3.0Ghz, 8GB Ram, HD4000 Video
- 5 Year Available Warranty (Next Business Day)
- Fusion with eFilm Site License
- H:14.17" x W:6.89" x D:16.42"
- Weight: 19.55 lbs

**SoundBank Enterprise**

- Dell Industrial Server Platform (rack/tower)
- 1TB RAID1, 4TB RAID5 & Global Hot Spare
- Intel Xeon E5-2609, 2.40 GHz, 8GB Ram
- 5 Year Available Warranty (4hr, 24/7 Support)
- Redundant PSU -1100 Watts
- Industry Standard UPS System
- Fusion Server Software




# Order Summary

Order No: QUO-29904-Y9R4R8

Revision: 2

**PRESENTED TO:**

Date: 8/19/2015

Clinic: Animal Hospital of Saddle River

Contact: Kathleen Hefner

Address: 171 E Saddle River Rd

Saddle River, NJ, 07458-2600

Phone: (201) 236-2963

Fax: (201) 236-2964

Requested Delivery
Manager Approval
OFFER VOID 30 DAYS FROM ISSUE

Email Address: khefnervet@hotmail.com

Sales Specialist: Abe Rodriguez

| Description | Product ID | QTY | Amount |
|---|---|---|---|
| SmartDR 1417G* | 91-700 | 1 | $84,000.00 |
| SoundBank | 20-824 | 1 | $5,000.00 |
| ReadyView Workstation | 20-822 | 1 | $4,250.00 |
| Installation/Training | 90-440 | 1 | $4,000.00 |
| SmartDR Accessory Kit | 74-832 | 1 | $850.00 |
| Ultra Flat Wall Mount v2 | 30-341 | 1 | $450.00 |
| Ultra Flat Wall Mount v2 | 30-341 | 1 | $450.00 |
| Xray Machine Retro Fit Kit (Non-Refundable) | 90-428 | 1 | $295.00 |
| Musica Imaging License | 60-171 | 1 | $0.00 |
| iPad Air WiFi 16GB Silver | 20-302 | 1 | $0.00 |
| **Total List Price** | | | **$99,295.00** |
| **Additional Discount** | | | **($48,385.00)** |
| **Total Tax** | | | **$3,563.70** |
| **Net Selling Price** | | | **$54,473.70** |



Lori Smith 973-291-6236 p.2



# Order Summary

Order No: QUO-29904-Y9R4R8

Revision: 2

Special Instructions: ALL COMPONENTS ARE NEW AND UNUSED.
ANTECH WILL FUND $52,000.00 FOR THE NET AND ONE-TIME SHIPPING/INSURANCE CHARGE. CUSTOMER IS RESPONSIBLE FOR THE SALES TAX. THE SALES TAX IS SUE AT THE TIME OF SIGNING (SEE CREDIT CARD AUTHORIZATION FORM ON THE LAST PAGE).

SOUND IS PLEASED TO SUBMIT THIS QUOTATION FOR THE PRODUCTS DESCRIBED HEREIN, SUBJECT TO THE ENCLOSED TERMS AND CONDITIONS OF SALE.

| | |
|---|---|
| TAXES: | ALL AMOUNTS PLUS TAXES. (TO BE ITEMIZED ON FINAL INVOICE) |
| WARRANTY: | AS SET FORTH IN APPLICABLE SOUND ASSURANCE PREMIER WARRANTY & SERVICE PROGRAM EXECUTIVE SUMMARY. |
| DELIVERY: | FOB SHIPPING POINT, $1090 PER SYSTEM SHIPPING/HANDLING/INSURANCE. |
| PAYMENT: | 20% DEPOSIT CALCULATED ON TOTAL HEREIN, DUE ON SUBMISSION OF ORDER. BALANCE DUE FROM CUSTOMER OR FROM CUSTOMER-OBTAINED THIRD-PARTY FINANCING UPON PRODUCTION OF FIRST AVAILABLE IMAGE. |
| DISCOUNT: | DEMONSTRATION STOCK ITEMS MAY BE USED - STANDARD WARRANTY TERMS. |
| VOID: | PROPOSAL VOID 30 DAYS AFTER ISSUANCE. VOID IF STOCK ITEMS UNAVAILABLE. |

If Sound incurs any collection expenses for past due payments, you agree to reimburse us for such expenses per the Terms and Conditions of Sale attached hereto. Order changes may be submitted up to 4 weeks prior to the scheduled delivery and installation date or within 3 business days after receipt of your signed purchase order. If we accept late requests or order changes, delivery and installation may be delayed. We reserve the right to accept or deny order changes and late change requests, for any, or for no reason, at our discretion. Delivery and installation will be scheduled separately. Once scheduled, any change to the delivery and installation date may result in additional charges.

Prices shown on above do not include taxes. Where applicable, taxes will be added and shown separately on invoices at the time of billing.

This offer and purchase order is subject to the Terms and Conditions of Sale attached hereto, and made a part thereof. Deposits are non refundable. Order may not be cancelled, by you, for any reason. This purchase order is binding on Sound when it is accepted by Sound. By signing, you acknowledge you have read & agree to the Terms & Conditions and Sale attached hereto.

Purchaser Order Accepted By:

| | | |
|---|---|---|
| Kathleen Hefner, DVM | 201-236-2963 | khefnervet@hotmail.com |
| (Signature) | (Phone Number) | (Email) |
| KATHLEEN HEFNER, DVM | PRACTICE OWNER | 9/2/15 |
| (Print Name) | (Title) | (Date) |

PURCHASER IS RESPONSIBLE FOR ALL NECESSARY OR REQUIRED FACILITIES MODIFICATIONS, CABLING, WALL-MOUNT & CABLE PORT INSTALLATION, AND REMOVAL OF EXISTING ITEMS. NETWORKING OF SERVER TO EXISTING ITEMS IS NOT INCLUDED. IF SOUND IS REQUESTED TO PERFORM ANY OF THESE OR OTHER ADDITIONAL SERVICES, LABOR AND MATERIAL CHARGES WILL APPLY AT $150 PER HOUR WITH A 1 HOUR MINIMUM.

DELIVERY AND INSTALLATION WILL BE SCHEDULED UPON MUTUAL AGREEMENT OF SOUND AND PURCHASER. ANY PURCHASER REQUESTED CHANGE TO AGREED UPON DELIVERY AND INSTALLATION DATES MADE LESS THAN 14 DAYS PRIOR TO AGREED UPON DELIVERY AND INSTALLATION DATES WILL BE SUBJECT TO $2,500 RESCHEDULING FEE.

IF EXISTING X-RAY TABLE/GENERATOR IS BEING RETROFITTED SOUND DOES NOT GUARANTTEE SYSTEM COMPATIBILITY. COMPATIBILITY PROBLEMS MAY NOT BE APPARENT UNTIL ACTUAL SYSTEM INSTALLATION. PURCHASER WILL BE RESPONSIBLE FOR ANY TABLE MODIFICATIONS/UPDATES REQUIRED TO INTERFACE WITH SOUND DIGITAL SYSTEM.

8/17/15

RE- Autorenewal

Animal Hospital Of Saddle River

Account #- 180505

Please be advised as the owner of Animal Hospital of Saddle River, I would NOT like the attached agreement to autorenew upon its expiration.

Sincerely,

Kathleen Hefner, DVM

Dr Kathleen Hefner